IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TOMMY DILLE, | ) | CASE NO. 1:06 CV 448 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| LVI ENVIRONMENTAL SERVICES, | ) | |
| INC., *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| Defendants. | ) | |

## I.  Introduction

Before the Court[1] in this matter – an alleged breach under both state and federal law of a union's duty not to discriminate in representing its members[2] – is a motion by Defendant Building Laborers Union Local 310 ("Local 310" or "the Union") for judgment on the pleadings or, alternatively, for summary judgment.[3]  Plaintiff Tommy Dille has responded in opposition to this motion.[4]  Supplemental memoranda by both sides were filed before[5] and after[6] the parties participated in an oral argument on the motion.[7]

---

[1] The parties have consented to the exercise of jurisdiction by the Magistrate Judge. *See*, ECF # 20.

[2] ECF # 1 (complaint), # 14 (amended complaint).

[3] ECF # 6.

[4] ECF # 12.

[5] ECF # 39 (Local 310).

[6] ECF # 51 (Local 310), # 52 (Dille).

[7] ECF # 50.

For the reasons that follow, the Court finds that:  (1) federal law preempts state law with regard to Dille's claim that the Union discriminated against him in how his grievance and verbal complaints against the employer were handled, and (2) the Union is entitled to summary judgment on Dille's claims against it.

## II.  Facts

Although the parties have presented copious amounts of often conflicting evidence as to many facts arising out of Dille's employment and subsequent dismissal, the salient facts are relatively straightforward, of record, and not in dispute. The legal significance of these facts will be discussed later.

In September of 2005, Tommy Dille, a partially disabled,[8] African-American member of Local 310,[9] was directed by the Union to a job as a laborer at co-defendant LVI Environmental Services (LVI), a signatory to the multi-employer collective bargaining agreement with Local 310.[10] The job required Dille to perform asbestos abatement on an LVI construction project at the Cleveland Museum of Art.[11]

---

[8] Dille has a breathing impairment requiring him to use a respirator while working. *See*, ECF # 13 (affidavit of Tommy Dille) at Ex. A (2005 Ohio Department of Health medical examination form for asbestos hazard abatement workers).

[9] There is no dispute as to Dille's race or membership in the Union.

[10] *See*, ECF # 51, Ex. 1(affidavit of Local 310 Business Manager John Kilbane) at ¶ 2.

[11] ECF # 6 (Union's motion for summary judgment) at 1; ECF # 1 (complaint) at ¶¶ 11, 12.

Immediately upon reporting for work at the job site on September 20, 2005, Dille filled out a job application; attached a medical examination form signed by a physician noting his need for a respirator while on the job; and requested that LVI provide him, at its expense, with a full-face respirator known as a PAPR.[12]  LVI then responded through the on-site operations manager that it would not pay for such a respirator and that Dille should undergo a new medical examination to document any medical restrictions.[13]

After orally informing the on-site Union steward of these events on September 23, 2005, Dille was provided with a PAPR by LVI without a new examination and at LVI's expense before beginning his work in asbestos abatement.[14]  Although the purported failure of LVI to provide him a PAPR and the alleged unresponsiveness at the time of the Union steward to his complaints are given as grounds for relief in his present complaint,[15]  Dille

------

[12] ECF # 52, Ex. A (affidavit of Dille) at 1.  PAPR is an acronym for a "power air purifying respirator."  Dille testified in his deposition that since some form of a mask or respirator is always needed when working with asbestos, a PAPR is different by virtue of the fact that it mechanically draws air through the facemask into the body, thus relieving stress on the wearer's lungs.  *See*, ECF # 40 at 200.

[13] *Id*. at 1-2.

[14] *See*, ECF # 39 (Local 310 supplemental brief) at 3, quoting Dille deposition, ECF # 40 at 61.

[15] ECF # 14 (amended complaint) at ¶¶ 15-16, 87-88.

never filed a written grievance with the Union over these events and does not here dispute that he began work with a PAPR provided by LVI.[16]

Having begun at the Art Museum job, Dille contends that he was almost immediately subject to comments that he felt were racially motivated by an LVI supervisor.  The record reflects three episodes that were reported to the Union both orally at the time of the event and later in writing.

As noted in his October 20, 2005 hand-written grievance submitted to the Union, Dille complained that the first incidence of "persecution" with a "racial motivation" occurred on September 27, 2005.[17]  Dille states that he was prepping his work area when the LVI superintendent, Phillip Lupkes, told Dille,[18] "Every time I see you, you're not working."[19] In the grievance, Dille relates that he promptly explained to Lupkes that he had been away from his work area to get a replacement light bulb.[20]  But Dille notes in his grievance that

---

[16] The parties do not agree as to whether the Union steward had a role in resolving the dispute with LVI over the PAPR.  *Compare* ECF # 39 (the Union) at 3 (Local 310 contends that Dille admits to having "no knowledge of what role" the steward may have played in resolving the matter) and ECF # 52, Ex. A (Dille affidavit) at 4 (Dille claims that he had "by himself" resolved the dispute with LVI and any contention that the Union steward was involved in the resolution is "false").  However, Dille also states at the same paragraph in his affidavit that "the issue was moot and resolved" prior to his beginning work.

[17] ECF # 13, Ex. B at 1.

[18] Dille stated in his original hand-written grievance that Lupkes "stopped me" as Dille "started to pass the superintendent" in the process of "walk[ing] back to the work area." ECF # 13, Ex. B at 1.  However, in his supplemental affidavit in this matter, Dille states that it was Lupkes who "walked up to [me]" to make the remark.  ECF # 52, Ex. A at 2.

[19] ECF # 13, Ex. B at 1(hand-written grievance), ECF # 52, Ex. A at 2.

[20] ECF # 13, Ex. B at 1-2.

Lupkes responded that "it doesn't change the fact that I was not in the work area and that they might have to get rid of you."[21]

Dille's grievance form also notes that he characterized Lupkes's tone in making this comment as "very harsh" and unwarranted by the situation.[22] In his supplemental affidavit, Dille states that he believed at the time that the remark was racially motivated and so told his Union steward.[23]

Approximately an hour later,[24] Lupkes again approached Dille who was working with a white employee and told Dille either, "Every time I see you, you're out of the work area,"[25] or simply told Dille that he "was not working."[26] As with the earlier incident of that day, Dille had an explanation for Lupkes, which was that he and his fellow employee had been "looking for light to illuminate their work area."[27] Also as with the earlier event of

---

[21] *Id.*  Dille does not relate any immediate exchange of words with Lupkes at this time in his supplemental affidavit.

[22] *Id.*

[23] ECF # 52.

[24] In his supplemental affidavit Dille gave the time of this second incident of September 27, 2005, as "approximately 10:15 A.M." ECF # 52, Ex. A at 3.  The handwritten grievance simply states that "[t]here was one other incident on September 27, 2005." ECF # 13, Ex. B at 2.

[25] ECF # 52, Ex. A at 3 (supplemental affidavit).

[26] ECF # 13, Ex.  B at 2 (handwritten grievance).

[27] ECF # 52, Ex. A at 3.  Dille's hand-written grievance does not relate that he and his white co-worker were looking for illumination at this time, but rather states only that Dille was "on a ladder attempting to route a cable through the ceiling" when this remark was made. ECF # 13, Ex. B at 2.

September 27, 2005, Dille related in his written grievance that Lupkes's comments about Dille not working were "out of line" and "uncalled for" since "every time he spoke to me he was never correct in his observations of my actions."[28]

 Dille concluded in the written grievance that he "also felt that there was some racial motivation [for the remarks] because there was no minority supervision" at this job site.[29] The Union steward on the job site, Fred DiFiore, was aware at the time of Dille's complaints arising out of Lupkes's remarks of that day and also understood that Dille saw these comments as a "black white thing."[30]

The parties do not agree as to whether there was a meeting shortly after September 27, 2005, between Dille, the Union steward, and LVI managers where Dille's complaints about these allegedly racially-motivated remarks at the job site were discussed.[31]  There is no dispute, however, that subsequent to these initial complaints Dille incurred a minor foot injury on the job[32] and, when he returned to work the next day, he learned that he had been transferred to a different work crew.[33]

---

[28] ECF # 13, Ex. B at 3.

[29] *Id.*

[30] *See*, ECF # 49 (Fred DiFiore deposition) at 21.

[31] *Compare*, *id*. at 20 (there was a meeting) and ECF # 52, Ex. A at 4 (there was not a meeting).

[32] ECF # 52, Ex. B at 4-5.

[33] *See,* ECF # 42 (deposition of Thomas Jackson, LVI project manager) at 56-58.

DiFiore and Thomas Jackson, the LVI project manager, relate that this crew change was proposed to LVI as a way to give Dille a fresh start and that Dille was told of the reasons for the change.[34]  Dille contends that he wasn't told that management was dissatisfied with his performance and that his new crew was all white and included the crew chief's father and brother.[35]

Despite this transfer, there is no dispute that on October 7, 2005, Dille reported another incident on the job site involving Lupkes.  According to Dille, Lupkes again "walked over" to where Dille and a white co-worker[36] were unloading and stacking ceiling tile and said, "Every time I see you, your (sic) never doing anything."[37]  In his grievance, Dille again states that he immediately provided Lupkes with an explanation of what he was doing.[38]

But, as before, Dille believed Lupkes ignored his response and, moreover, failed to reprimand Dille's white co-worker who, according to Dille, "was standing against the wall not doing anything."[39]  Dille told the Union in his grievance that, as a consequence of both

---

[34] *Id*. at 57; *see also*, ECF # 49 at 31, 81.

[35] ECF # 52, Ex. A at 5.

[36] This worker was not the same one as in the earlier incident.  *See*, n.37, infra.

[37] ECF # 13, Ex. B at 2.  As before, Dille twice relates Lupkes's words on this date slightly differently in his supplemental affidavit:  "Every time I see you, you're not working."  *See*, ECF # 52, Ex. A at 3, 5.

[38] ECF # 13, Ex. B at 2.

[39] *Id.*  Dille states that the white co-worker standing against the wall was the father of his new crew chief.  *See*, ECF # 52, Ex. A at 5.

this comment and Lupkes's inattention to the white co-worker, he believed "there was some racial motivation or intent" in Lupkes's actions.[40]

Dille in his supplemental affidavit states that following these remarks on October 7, 2005, he once again approached Fred DiFiore, the on-site Union steward, to tell him what occurred and to complain that, in his opinion, "the September 27, 2005 incidences and the October 7, 2005 incident were racially motivated."[41]

A few days later,[42] a meeting was held at the job site attended by LVI managers and Local 310 steward DiFiore, where the project manager, Tom Johnson, and Lupkes expressed concern that the abatement work was not proceeding fast enough.[43]  After inquiring as to which workers may be contributing to the problem, Dille and two female workers were identified as being slow.[44]  Dille was subsequently discharged on October 14, 2005, for poor performance.[45]

_____

[40] ECF # 13, Ex. B at 2.

[41] ECF # 52, Ex. A at 6.

[42] October 12, 2005.

[43] ECF # 52, Ex. A at 6.

[44] *Id*. *See also*, ECF # 49 (deposition of DiFiore) at 42.

[45] *Id.* at 6-7.  The record here shows that "both Caucasian and African-American members" of Local 310 were laid off along with Dille.  *See*, ECF # 6, Ex. 2 (Kilbane affidavit) at 1.  However, the Court has not been directed to any evidence in the record conclusively identifying whether the white members laid off at the same time as Dille were the two women identified as being slow workers at the October 12, 2005, meeting.

Dille states that he went to Union headquarters on October 18, 2005, to discuss filing a grievance concerning his discharge with Sebastian "Busty" Trusso, Local 310's business agent.[46]  Although the parties do not agree as to exactly what Trusso said[47] or did,[48] it is not disputed that subsequent to this meeting with Trusso, Dille asked for and received an appointment two days later to present his grievance directly to Local 310's business manager, John Kilbane.[49]

After Dille told Kilbane at their meeting that he believed that he was the victim of racial discrimination on the job site, all parties agree that Kilbane produced a grievance form for Dille to complete, had him fill out the form and accepted it on behalf of Local 310.[50]

---

[46] *Id*. at 7.

[47] Dille represented in his first amended complaint that Trusso said to him during this meeting, "What is it with you guys filing grievances?"  ECF # 14 at 21.  In his supplemental affidavit, Dille recounts Trusso as saying, "You people think that everything is racial."  ECF # 52, Ex. B at 7.  Dille repeats the account of Trusso employing the reference to race in his deposition. ECF # 40 at 228.  In his deposition, Trusso denies making  "any racially motivated statement to Tommy Dille or anyone else in this Union hall, ever."  ECF # 48 at 48.

[48] Trusso testified that he told Dille he had persuaded LVI to re-classify the dismissals as layoffs. ECF # 48 at 46-47.  Dille contends that Trusso's intervention with LVI concerned earlier layoffs at the Art Museum job and was not for the purpose of assisting Dille.  *Id.*

[49] ECF # 52, Ex. B at 7.

[50] *Id*. at 7-8.

As the Union's business manager, Kilbane initially made a determination that Dille's written complaint was not "blatantly frivolous."[51]  He then sent Dille's written grievance to Local 310's legal counsel for evaluation.[52]  He also directed Trusso to "investigate to see if there was any racial activity going on up there [at the Art Museum job site], ... to see if there was anything contravening the contract regarding discrimination."[53]

Although Kilbane gave Trusso no specific instructions as to how to conduct this investigation, Kilbane testified that he expected that as part of the investigation Trusso would speak with Dille's supervisor as well as to senior on-site LVI management.[54]  He did not require Trusso to file a written report of the investigation.[55]

In fact, Trusso did not believe that he had been told by Kilbane to commence an investigation of Dille's grievance.[56]  According to Trusso, his function was simply to deliver a copy of Dille's written grievance to the LVI site superintendent.[57]  Nevertheless, after

---

[51] ECF # 47 (deposition of John Kilbane) at 7.  Dille contends that Kilbane made an initial determination that Dille's grievance had "merit."  ECF # 52, Ex. B at 8.  A review of Kilbane's deposition discloses, however, that what Kilbane specifically testified he did in his initial review of a grievance was to "assess the grievance to make sure it wasn't *frivolous*; ... and unless it's *blatantly frivolous*," he would refer it to counsel for its evaluation. ECF # 47 at 6-7 (emphasis added).

[52] *Id.* at 8.

[53] *Id*. at 7-8.

[54] *Id.* at 8-9.

[55] *See*, *id.* at 31.

[56] ECF # 48 at 60.

[57] *Id.*

delivering Dille's grievance, Trusso and DiFiore briefly discussed Dille's complaints while Trusso "made a mental count" of how many minority workers were on site.[58]

Trusso then apparently made an oral report to Kilbane to the effect that Dille's complaint had no merit.[59]  Kilbane also spoke with DiFiore,[60] the on-site Union steward, as well as with others at the site and concluded that the Union should not pursue Dille's grievance.[61]  Essentially, Kilbane concluded that Dille 's grievance "lacked merit,"[62] since there was no evidence of a racial atmosphere on the job and that Dille had been laid off for "lack of production," which was within management's rights under the contract.[63]  Dille was notified of this decision in a letter from the Union's attorney on November 9, 2005.[64]

---

[58] *Id*. at 64-66.

[59] *See*, *e.g.*, ECF # 47 at 30.  Although there are many instances in the deposition record, such as here, where inquiries are framed on the premise that Trusso provided an oral report to Kilbane after his visit to the job site, the Court was unable to locate a specific, definitive question that conclusively established that Trusso actually made such a report at that time.

[60] Although Kilbane spoke with DiFiore, the Union steward, he did not review DiFiore's log book of events at the site.  *See*, ECF # 47 at 31.

[61] *Id*. at 31-32.

[62] ECF # 6, Ex. 2 (Kilbane affidavit) at 2.

[63] ECF # 47 at 26.

[64] ECF # 6, Ex. 3.

Dille thereupon filed a complaint with the Ohio Civil Rights Commission alleging that he was "fired due to my race, Black, and in retaliation for complaining of racial discrimination...."[65]  He received a right to sue letter on December 14, 2005.[66]

Dille here asserts that he was wrongfully discharged by LVI due to either his race or his disability.[67]  He further contends that, when the totality of the circumstances are examined, LVI breached a provision of the collective bargaining agreement with the Union requiring it not to discriminate against Dille, and the Union violated federal law when it failed in its duty to fairly represent Dille by pursuing his grievance over that discharge in "a perfunctory manner."[68]  He also maintains that the Union and LVI violated the Ohio civil rights statute when they exhibited discriminatory conduct toward Dille.[69]

The Union argues that it is permitted to exercise discretion in determining which grievances it presents to management.[70]  Local 310 asserts that Dille's complaint was reviewed by Union officials who determined, also based on a totality of the evidence, that Dille was validly discharged for performance reasons.[71]

---

[65] ECF # 1, Ex. A.

[66] *Id.*, Ex. B.

[67] *See*, ECF # 52 at 5.

[68] *Id*. at 6.

[69] *Id.*

[70] ECF # 39 at 6.

[71] *Id*. at 7.

As noted, Local 310 further contends that Dille's civil rights claims against it arising under Ohio law are preempted here by federal law.[72]  Dille disputes that assertion.[73]

### III.   Analysis

**A.     Federal preemption**

Dille's claim against Local 310 is essentially that the Union failed to go to bat for him against the employer, LVI, and that Dille's race motivated the failure.  As explained by his counsel at the oral argument, Dille's claims have two components.  First, the Union failed to pursue his written grievance of his termination beyond step three of the grievance process provided by the collective bargaining agreement (CBA).  Second, the Union failed to take any action on his verbal complaints made before termination about discriminatory comments made to him by LVI's superintendent, Phillip Lupkes.

Dille's counsel conceded at oral argument that the claim of failure to pursue the written grievance is a claim under § 301 of the Labor Management Relations Act and preempted by the Act.  This concession is appropriate and supported by case law.  As the Sixth Circuit held in *In re Glass, Molders, Pottery, Plastic and Allied Workers International Union, Local No. 173*, claims relating to representation through the grievance process are governed by federal law and preempted.[74]

---

[72] ECF # 51 at 2-5.

[73] ECF # 52 at 3-12.

[74] *In re Glass, Molders, Pottery, Plastic & Allied Workers Int'l Union, Local No. 173*, 983 F.2d 725, 728 (6th Cir. 1993).

Dille argues, however, that his claims based upon the verbal complaints of discriminatory comments are not § 301 claims but, rather, state law discrimination claims under Ohio Revised Code § 4112.02.

As framed by the arguments of the parties, the question presented is whether the state law claims require interpretation of the CBA or arise from a breach of the CBA.[75]

In reality, however, the question this Court must decide is broader.  As the district court clearly explained in *Taylor v. Giant Food, Inc.*,[76] claims implicating a union's duty of fair representation arise first and foremost from the union's federal statutory status as the exclusive bargaining agent for its employees.[77]  For this proposition, the *Taylor* court quoted the Supreme Court's decision in *Vaca v. Sipes*:[78]

> Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated union includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.[79]

Whether the duty of fair representation arises from the federal statutory scheme designating the union as the exclusive bargaining agent and imposing the duty of fair representation, or from the terms of the collective bargaining agreement, claim of breach of that duty

---

[75] *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 413 (1988); *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir. 1989) (en banc).

[76] *Taylor v. Giant Food, Inc.*, 438 F. Supp. 2d 576 (D. Md. 2006).

[77] *Id.* at 582-83.

[78] *Vaca v. Sipes*, 386 U.S. 171 (1967).

[79] *Taylor*, 438 F. Supp. 2d at 583 quoting *Vaca*, 386 U.S. at 177.

completely preempts state law.[80]  The Court in *Taylor* cited with approval the Sixth Circuit's decision in *In re Glass Workers*.[81]

Sixth Circuit case law supports the conclusion that a duty of fair representation claim arising out of a union's federal statutory status as the exclusive bargaining agent for its employees preempts state law discrimination claims.  In *Welch v. General Motors Corp.*,[82] the plaintiff, Welch, brought a state law claim under Michigan's handicapped discrimination statute alleging that the defendant union had failed to pursue his complaints against the employer.  Welch alleged that his handicap motivated the union's default.  The court held the state law discrimination claims preempted because state statute created no new rights for the employee and imposed no duties on the union not already clearly present under existing federal labor law.[83]  The preemption inquiry here, therefore, must turn on whether Dille's state law claim asserts any right or calls upon any duty imposed on the Union that does not already exist under federal labor law.

Dille's claim that the Union did not intervene on his behalf when he complained about the alleged discriminatory comments made by Lupkes amounts to no more or no less than a claim that the Union failed to effectively represent him at that time.  As defined by the Supreme Court in *Vaca*, that duty is a statutory duty imposed by the Union's

---

[80] *Taylor*, 438 F. Supp. 2d at 583.

[81] *Id.* at 584 n.11.

[82] *Welch v. Gen. Motors Corp.*, 922 F.2d 287 (6th Cir. 1990).

[83] *Id.* at 294.

federally-created status as the exclusive bargaining agent of all its employees.[84]  As such, that

claim is preempted.

**B.     The merits of Dille's breach of duty of fair representation claim**

*1.     Standard of review – motions for summary judgment*

Local 310 has moved for summary judgment on Dille's duty of fair representation

claim.  The standard for reviewing motions for summary judgment is well-established and

well-known.  Federal Rule of Civil Procedure 56(c) provides in pertinent part:

> The judgment shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits,
> if any, show that there is no genuine issue as to any material fact and the
> moving party is entitled to judgment as a matter of law.

The moving party has the initial burden of showing the absence of a genuine issue of

material fact as to an essential element of the non-moving party's case.[85]  Once the moving

party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts

showing a triable issue.[86]

Determination that there is a dispute as to an issue of material fact requires the

application of evidentiary standards.[87]  However, "[a] non-moving party need not 'produce

evidence in a form that would be admissible at trial to avoid summary judgment.'  Instead,

the relevant inquiry is whether the non-moving party has designated 'specific facts showing

---

[84] *Vaca*, 386 U.S. at 177.

[85] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[86] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

[87] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

there is a genuine issue for trial.'" [88]Nevertheless, the non-moving party may not simply rely on the mere allegations of its pleading.[89]

Courts must evaluate the evidence presented "in the light most favorable to the party opposing the motion."[90]  However, the reviewing court must not weigh the evidence so as to determine the truth of the matter but determine if there is a genuine issue of material fact for trial.[91]

A dispute concerning a material fact is "genuine," thus placing the matter beyond the reach of summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[92]  A fact is "material" if it is required to establish "an essential element of [the non-moving party's] case with respect to which it has the burden of proof."[93]

In the end, as the Sixth Circuit has stated, summary judgment is designed to allow the movant to "challenge the opposing party to 'put up or shut up' on a critical issue."[94]

---

[88] *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 505 (6th Cir. 1992) (internal citations omitted).

[89] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[90] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[91] *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

[92] *Anderson*, 477 U.S. at 248.

[93] *Celotex*, 477 U.S. at 323.

[94] *BDT Products v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

2.      *Standard of review – breach of the duty of fair representation*

Section 9(a) of the LMRA[95] provides:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment....

The Supreme Court has determined that this statutory grant of authority to a union encompasses all activities that may be required to represent members of the bargaining unit in "the negotiation, administration, and enforcement of collective bargaining agreements."[96] Because the union is granted exclusive authority to act for its members in all aspects of the employment relationship, the Supreme Court has concluded that the union has a duty to represent its members "without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."[97] This duty has been termed the duty of fair representation.[98]  As noted, because this duty is created in federal law, its scope is defined solely by federal law.[99]

---

[95] 29 U.S.C. § 159(a).

[96] *Int'l Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 47 (1979).

[97] *Vaca*, 386 U.S. at 177.

[98] *Id.*

[99] *Id.*

-18-

As stated in *Vaca*, a union breaches its duty of fair representation when its "conduct toward a member of the bargaining unit is arbitrary, discriminatory or in bad faith."[100] A union's conduct is impermissibly arbitrary when it "handles a grievance in a 'perfunctory' manner, with caprice or without rational explanation."[101] "[M]ere negligence or mistaken judgment" also will not render a union liable for a breach of the duty of fair representation.[102] When, in its discretion, a union declines to grieve a member's complaint after due investigation and evaluation of its merits, it similarly does not breach its duty to fairly represent the member.[103]

In the end, the Supreme Court has held that a union's conduct is "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' ... as to be irrational."[104] In that regard, the Sixth Circuit has noted that "an unwise or even an unconsidered" decision by a union is not necessarily an irrational decision.[105]

---

[100] *Id.* at 190.

[101] *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983).

[102] *Id.*

[103] *Id.* at 184 (collecting cases); *see also*, *Driver v. U.S. Postal Serv.*, 328 F.3d 863, 869 (6th Cir. 2003).

[104] *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 111 (1991) (internal citation omitted).

[105] *Nida v. Plant Prot. Ass'n Nat'l*, 7 F.3d 522, 526 (6th Cir. 1993).

-19-

3.    *The Union here did not, as a matter of law, breach its duty of fair representation toward Dille and so is entitled to summary judgment.*

The evidence here supports the Union's position that it did not breach its duty of fair representation in how it handled Dille's complaints.  Using only uncontroverted evidence in the present record, and construing everything in the light most favorable to Dille, the non-moving party, Dille, saw discriminatory animus behind comments and actions that the Union did not.  He expected immediate action to be taken by the Union based on his view of the situation that the Union, in its discretion, declined to take.

In the first instance when Dille experienced some difficulty in receiving a PAPR paid for by LVI, Dille acknowledges that the Union steward at the job site was immediately told about the problem, further acknowledges that the matter was fully and satisfactorily resolved before Dille commenced work, but denies that the Union had any role in that resolution.  Even if Dille's conclusion that he alone resolved this matter was accepted as true (and there is no evidentiary basis established in the record by which he could know what the Union may or may not have done directly with LVI to promote a resolution favorable to him), there is no direct evidence in the record that the Union steward explicitly refused to pursue this complaint or believed it was unimportant.  Neither is there any indirect evidence that the Union delayed or impeded a resolution of the complaint; in fact, the matter was promptly resolved in Dille's favor.

Similarly, the undisputed evidence concerning the remarks made at the job site on September 27, 2005, is clear that the Union steward accepted Dille's complaints about those comments; said nothing to Dille to indicate that the Union would not take the complaint

seriously; and understood, although the supervisor's remarks about Dille not working contained nothing that was overtly or explicitly racial, that Dille considered them to be racially motivated.  There is no evidence that Dille's initial complaints were simply dismissed out of hand by the steward or that Dille was belittled or chastised for going to the Union representative.

Although Dille denies that a meeting was arranged by the Union for Dille to discuss the remarks of September 27, 2005, with LVI, he does not deny that on October 6, 2005, he was transferred from his initial work crew to another crew at the suggestion of the steward, whose uncontroverted testimony is that this was done to give Dille a fresh start with a new crew.  While Dille may contend that he should have been told that this transfer was also done in the context of management complaints about Dille,[106] the evidence is undisputed that the Union arranged that he get a fresh start in a new crew.  Again, while Dille may contest the wisdom of this approach, the transfer does demonstrate that the Union was aware that a problem existed on the job site, for which Dille and LVI had differing explanations, and that the Union was actively looking for a solution.

Dille contends that the final sequence of events – the remarks of October 7, 2005, the meeting of LVI managers, with the Local 310 steward present, on October 12, 2005, to

---

[106] Dille's specific assertion is that he was never told at this time by management or by the Union that he was "in danger of being discharged due to poor performance and/or lack of productivity."  ECF # 52, Ex. A at 5.

discuss performance on the job, and the dismissal on October 14, 2005 – all show that the Union steward failed to "intercede" for him with LVI.[107]

In fact, as noted, a union or its representative may exercise its discretion as to how far it chooses to pursue a member's grievance.  Here, the Union steward had knowledge of both Dille's assertions that performance complaints made against him were racially motivated and LVI's contention that Dille was deficient in his performance.  The steward, who all parties agree was physically present at the job site during these events, also knew at the time of the meeting where discharges were discussed that Dille had been placed in a new crew so as to receive a fresh start.  Finally, he was aware of Dille's disability as modified by the PAPR and that LVI had contractual authority to discharge workers for poor performance, which Dille does not deny.  Moreover, and critical to Dille's clams, the steward, by virtue of being continuously on the job site, would have had direct, firsthand knowledge of whether there was a racially biased environment on the job.

Thus, given this extensive history and knowledge, much of it gathered directly, if DiFiore, the Local 310 steward, concluded that LVI was correct in its assessment of Dille's work performance, or even more simply that LVI would likely prevail if its judgment was challenged, that decision by DiFiore at the time cannot be said to be arbitrary, discriminatory, or in bad faith.

In fact, given DiFiore's extensive knowledge of the facts and personalities of this dispute, and his uncontested role in arranging for a fresh start transfer in an attempt to resolve

---

[107] *See*, *id.* at 6.

it favorably to all sides, there is no credible basis by which a jury could conclude that his actions during the final week of Dille's employment at LVI were irrational, exhibited bad faith, or were without grounding in the "wide range of reasonableness."[108]  While Dille may well believe that DiFiore was mistaken in deciding not to raise an objection to LVI's action at the time, he cannot establish that the Union, acting through DiFiore, was without a substantial, rational basis to so decide, nor dispute that the law gives the Union the discretion to make such a decision.

Similarly, the actions taken by the Union after the discharge do not establish a breach of the duty of fair representation.  While Dille argues vehemently that there were numerous procedural defects in how the Union handled his written grievance,[109] he cannot show that the law imposes any specific procedure upon a Union in discharging its duty of fair representation. Rather than require that any specific procedural protocol be followed, the law of fair representation, as described above, looks to whether the Union's conduct was within the scope of reasonableness or, whatever the specifics of the procedure employed, was arbitrary, discriminatory or in bad faith.

Here, the evidence shows that Dille was able to present his grievance directly to Local 310's business manager, John Kilbane, who then took steps to make sure it was put in writing and was accepted for filing.  The evidence is also undisputed that Kilbane did not

---

[108] *Air Line Pilots Ass'n Int'l*, 499 U.S. at 67.

[109] Dille argues, as detailed earlier, that Trusso should have conducted a thorough investigation after being dispatched to the site by Kilbane, that Kilbane should have demanded a written report from Trusso, and that Kilbane should have examined the log book maintained by DiFiore.

dismiss the grievance at the filing stage, but took steps to further investigate the substance of the complaint.  Significantly, while it is apparent that there was, at a minimum, a misunderstanding by Busty Trusso as to what Kilbane expected of him as to this investigation, it is also clear, and not contradicted by Dille, that Kilbane, on his own, spoke with DiFiore, the Union steward at the job site, about Dille's grievance.[110]

As was discussed earlier, DiFiore was continuously present at the job site and had a reasonable basis, grounded in his detailed, personal knowledge of the situation, for providing Kilbane with information as to whether the comments by an LVI supervisor about Dille's work performance (which comments, it must be remembered, do not contain in themselves anything directly or explicitly racial) were legitimate or pretextual.  DiFiore would have also been able to remind Kilbane about his earlier attempt to remedy any job performance problems concerning Dille with the transfer.

Moreover, at the time he conducted this investigation, Kilbane also knew that Dille, an African-American, had been laid off by LVI along with Caucasians who had also been judged to be lacking in performance, thus giving rise to at least some reason to doubt Dille's view that the non-racial performance comments directed at him were actually racial harassment.  Kilbane also consulted with the Union's legal counsel before reaching his final decision not to pursue the grievance any further.

Given this information, and without regard to the procedural steps by which it was obtained, Kilbane's conclusion that Dille's grievance should not be prosecuted further, like

---

[110] *See*, ECF # 47 at 31.

DiFiore's decision before it not to object to LVI's decision to discharge Dille, does not violate the Union's duty of fair representation.  On this record, Dille cannot show that Kilbane and the Union were irrational, "perfunctory," or arbitrary in concluding that Dille's grievance ultimately lacked merit and should not be carried forward.

## IV.  Conclusion

Accordingly, for the foregoing reasons, Local 310's motion for summary judgment in its favor as to all claims against it is well-taken and is hereby granted.

IT IS SO ORDERED.


Dated:   August 24, 2007                        s/ William H. Baughman, Jr.
                                                United States Magistrate Judge

-25-